# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 04-4209, 04-4315 & 04-4321

UNITED AIRLINES, INC.,

*Plaintiff-Appellant*,

v.

HSBC BANK USA, N.A., as Trustee, and
CALIFORNIA STATEWIDE COMMUNITIES
DEVELOPMENT AUTHORITY,

*Defendants-Appellees.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 04 C 2836 & 2837—**John W. Darrah**, *Judge.*

———————

ARGUED MAY 5, 2005—DECIDED JULY 26, 2005

———————

Before BAUER, EASTERBROOK, and MANION, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* What is a "lease" in federal bankruptcy law? Businesses that do not pay up front for assets may acquire them via unsecured debt, secured debt, or lease; in each event the business pays over time. Similar economic function implies the ability to draft leases that work like security agreements, and secured loans that work

like leases. Yet the Bankruptcy Code of 1978 distinguishes among these devices. A lessee must either assume the lease and fully perform all of its obligations, or surrender the property. 11 U.S.C. §365. A borrower that has given security, by contrast, may retain the property without paying the full agreed price. The borrower must pay enough to give the lender the economic value of the security interest; if this is less than the balance due on the loan, the difference is an unsecured debt. See 11 U.S.C. §506(a) and §1129(b)(2)(A). There are other ways in which the Code treats leases differently from security interests, but they don't matter to today's dispute.

During the 1990s United Air Lines entered into complex transactions to obtain money to build or improve premises at four airports—San Francisco, Los Angeles, Denver, and John F. Kennedy in New York. For each airport, a public body issued bonds that, because of the issuer's status as a unit of state government, paid interest that is free of federal taxation. The public bodies turned this money over to United against its promise to retire the bonds and reimburse administrative costs. At each airport, United entered into a lease giving the body that had issued the bonds the right to evict United from operational facilities if it did not pay.

When United entered bankruptcy in 2002, however, it took the position that none of these transactions is a "lease" for purposes of §365. United proposed to treat each transaction as a secured loan, so that it could continue using the airport facilities while paying only a fraction of the promised "rent." Chief Bankruptcy Judge Wedoff concluded that the word "lease" in §365—a term not defined anywhere in the Bankruptcy Code—includes "true leases" but not transactions where the form of a lease is used but the substance is that of a security interest. Applying this approach as a matter of federal law, Judge Wedoff concluded that the Denver transaction is a true lease but that

the other three are not. *In re UAL Corp.*, 307 B.R. 618 (Bankr. N.D. Ill. 2004). This meant that United had to cure the default and resume full payments on its Denver deal but could reduce its payments on the other transactions and treat the difference as unsecured debt.

Everyone appealed. The district judge issued four opinions, one for each airport, and held that all four transactions are "true leases." Two are published: *United Air Lines, Inc. v. HSBC Bank USA*, 322 B.R. 347 (N.D. Ill. 2005) (Denver), and *HSBC Bank USA v. United Air Lines, Inc.*, 317 B.R. 335 (N.D. Ill. 2004) (San Francisco). Relying principally on *Butner v. United States*, 440 U.S. 48 (1979), and *In re Powers*, 983 F.2d 88 (7th Cir. 1993), Judge Darrah first concluded that state rather than federal law controls the distinction between security interests and leases. Then, applying California, Colorado, and New York law, he held that each transaction must be treated as a "lease." United has appealed in all of these adversary actions. The San Francisco dispute has been fully briefed; the other appeals are being held for the disposition of this one. Parties to the Los Angeles, Denver, and New York transactions have presented their views as *amici curiae*. We confine our attention in this opinion to the San Francisco transaction.

Since 1973 United has been the lessee of 128 acres, used for a maintenance base, at San Francisco International Airport. The lease will end in 2013 unless the parties negotiate an extension; rent depends on an independent party's estimate of the property's market value. In 1997 the California Statewide Communities Development Authority (CSCDA) issued $155 million in bonds for United's benefit. United received the proceeds for use in improving its facilities at the Airport—though not at the maintenance base. The transaction was accomplished through four documents.

!    *The sublease.* United subleases 20 acres of the 128-acre maintenance base to the CSCDA for 36

years. This term matches the debt-repayment schedule rather than United's lease with the Airport. The total rent CSCDA pays is $1.

! *The leaseback.* The CSCDA leases the 20 acres back to United for a rent (paid to HBSC Bank as the Indenture Trustee) equal to interest on the bonds plus an administrative fee. The lease has a $155 million balloon payment in 2033 to retire the principal. United may postpone final payment until 2038; if it does, the sublease also is extended. United also is entitled to prepay; if it does, the sublease and leaseback terminate. If United does not pay as agreed, the CSCDA may evict it from the 20 acres. The leaseback includes a "hell or high water" clause: United must pay the promised rent even if its lease from the Airport ends before 2033, the property is submerged in an earthquake (the Airport abuts San Francisco Bay), or some other physical or legal event deprives United of the use or economic benefit of the maintenance base.

! *The trust indenture.* The CSCDA issues the bonds, turns the $155 million over to United against the promises made in the sublease, and arranges for the Trustee to receive United's payments for distribution to the bondholders. The bonds are without recourse against the CSCDA.

! *The guaranty.* United commits its corporate treasury to repayment of the bonds.

That the sublease and leaseback have the form of "leases" is unquestioned. But does §365 use form, or substance, to distinguish "leases" from secured credit?

Although the statute does not answer that question in so many words, every appellate court that has considered the

issue holds, and the parties agree, that substance controls and that only a "true lease" counts as a "lease" under §365. See *In re PCH Associates*, 804 F.2d 193, 198-200 (2d Cir. 1986); *In re Pillowtex, Inc.*, 349 F.3d 711, 716 (3d Cir. 2003); *In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182-84 (9th Cir. 1988); *In re Pacific Express, Inc.*, 780 F.2d 1482, 1486-87 (9th Cir. 1986). See also, e.g., *In re Continental Airlines, Inc.*, 932 F.2d 282 (3d Cir. 1991) (same under 11 U.S.C. §1110, another part of the Code dealing with leases). We'll return to what a "true lease" might be; that term is no more self-defining than the bare word "lease." Before fleshing out the definition, we explain why we agree with these decisions, because the reasons for preferring substance over form affect *which* substantive features of the transactions matter.

Whether the word "lease" in a federal statute has a formal or a substantive connotation is a question of federal law; it could not be otherwise. See *Reves v. Ernst & Young*, 494 U.S. 56, 71 (1990); *Bryant v. Yellin*, 447 U.S. 352, 370-71 & n.22 (1980). (Whether federal law incorporates state law to answer the questions that result from this choice is a different issue, to which we turn later. Cf. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979).) The Bankruptcy Code specifies different consequences for leases and secured loans. If these were formally distinct—in the way that mergers and asset sales in corporate law are distinct—then the statutory reference might best be understood as adopting the established forms. But "lease" is a label rather than a form. A transaction by which A sells a widget to B in exchange for periodic payments, with B to own the asset after the last payment, could be structured as an installment sale, a loan secured by the asset, or a lease, with only a few changes in verbiage and none in substance. It is unlikely that the Code makes big economic effects turn on the parties' choice of language rather than the substance of their transaction; why bother to distinguish transactions if these distinctions can be obliterated at the drafters' will?

Many provisions in the Code, particularly those that deal with the treatment of secured credit, are designed to distinguish financial from economic distress. A firm that cannot meet its debts as they come due, but has a positive cash flow from current operations, is in financial but not economic distress. It is carrying too much debt, which can be written down in a reorganization. A firm with a negative cash flow, by contrast, is in economic distress, and liquidation may be the best option. In order to distinguish financial from economic distress, the Code effectively treats the date on which the bankruptcy begins as the creation of a new firm, unburdened by the debts of its predecessor. See generally *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562 (7th Cir. 1986). The new firm must cover all new expenses, while debt attributable to former operations is adjusted. Section 365, which deals with leases, classifies payments for retaining airplanes and occupying business premises as new expenses, just like payments for labor and jet fuel. The rules for credit, by contrast, treat debt service as an "old" expense to be adjusted to deal with financial distress.

This works nicely when rent under a lease really *does* pay for new inputs: each monthly payment on an airplane lease covers another month's use of a productive asset, just as payments for jet fuel do. But "rent" that represents the cost of funds for capital assets or past operations rather than ongoing inputs into production has the quality of debt, and to require such obligations to be assumed under §365 to retain an asset would permit financial distress from past operations to shut down a firm that has a positive cash flow from current operations. Imagine a lease of an airplane with a 20-year economic life that provided for no rental payments during the first 10 years, followed by rent at 2.5 times the market rate for the last ten (it exceeds twice the spot-market price because the payments must cover accrued interest on the deferrals). To separate financial from

economic distress it would be essential to separate the loan components of that "lease" from the current-consumption components. The cost of capital hired before the bankruptcy could be written down while the expenses of current operations continued to be met.

When Congress enacted the Bankruptcy Code in 1978, the legal system afforded rules that facilitated the disentangling of credit and consumption components of leases. Since 1939 this had been routine in tax law. See *Helvering v. F&R Lazarus & Co.*, 308 U.S. 252 (1939). See also, e.g., *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). During the 1940s and 1950s much state law on the subject was summed up and codified in the Uniform Commercial Code. Section 1-201(37) of the 1958 Official Text separates credit components, in which the asset serves as security, from consumption components this way:

> Unless a lease . . . is intended as security, reservation of title thereunder is not a "security interest" . . . . Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

A lease in which the consumption component dominates often is called a "true lease," while one in which the asset serves as security for an extension of credit is treated as a security agreement governed by the UCC's Article 9.

No legally sophisticated person writing in 1978 could have thought that the word "lease" in a text that distinguishes between current consumption (which must be paid for in full) and secured debt (which may be written down to

ease financial distress) means any transaction in the form of a lease. The need to look through form to substance would be apparent not only from the structure of the statute but also from the fact that many of the leased assets would be covered directly by the UCC. Section 365 in particular deals with leases of both personal and real property; it would not be sensible to read the same word as referring to substance when dealing with personal property and form when dealing with real property. The statute thus must refer to substance throughout §365. Nothing else respects both the structure of the Bankruptcy Code and the way the legal community understood the distinction between leases and security agreements in the 1970s.

Because the parties have made so much of the legislative history, we add that the understanding that §365 deals with substance rather than form is reflected in many of the documents that precede the Code's enactment. The passage to which the litigants pay the most attention reads:

> The phrase 'lease of real property' applies only to a 'true' or 'bona fide' lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security.

> [I]n a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease . . .

> Whether a 'lease' is [a] true or bona fide lease or, in the alternative, a financing 'lease' or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is

denominated as a 'lease'. The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration [or] for nominal consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property.

S. Rep. No. 989, 95th Cong., 2d Sess. 64 (1978). This passage is interesting because it illustrates how the legal community thought in 1978 about the roles of form versus substance in dealing with a word such as "lease." It would be a mistake to find rules of decision in this un-enacted passage, see *American Hospital Association v. NLRB*, 499 U.S. 606, 615-16 (1991), but it does show that Congress shared the legal community's understanding that some transactions with the form of a lease are best treated as security agreements.

To say that substance prevails over form as a matter of federal law is not to resolve all issues of detail—or for that matter to imply that federal law supplies the details. Which *aspects* of substance matter? The Senate Report does not supply the answer. "[R]estrictive language contained in Committee Reports is not legally binding." *Cherokee Nation v. Leavitt*, 125 S. Ct. 1172, 1182 (2005). Reports are not enacted and do not create rules independent of the text in

the United States Code. Anyway, this report sounds like a reminder to be sensible rather than a formulary.

Because nothing in the Bankruptcy Code says which economic features of a transaction have what consequences, we turn to state law. All of the states have devoted substantial efforts to differentiating leases from secured credit in commercial and banking law. Leases are state-law instruments, after all, and the norm in bankruptcy law is that contracts (of which leases are a species) and property rights in general have the same force they would have in state court, unless the Code overrides the state entitlement. See *Butner v. United States*, 440 U.S. 48 (1979); see also, e.g., *Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 20 (2000); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544-45 (1994); *Nobelman v. American Savings Bank*, 508 U.S. 324, 329-30 (1993); *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992). A state law that identified a "lease" in a formal rather than a functional manner would conflict with the Code, because it would disrupt the federal system of separating financial from economic distress; a state approach that gives a little more or a little less weight to one of several "factors" does not conflict with any federal rule, because there is none with which it *could* conflict. Cf. *In re James Wilson Associates*, 985 F.2d 160 (7th Cir. 1992).

United contends that the second and ninth circuits have held that federal law supplies the definition of a "lease" in addition to establishing a functional approach to the inquiry. Perhaps some language in *PCH Associates* and *Moreggia* could be read that way, though we think it more likely that both courts were concerned with the first question (whether the word "lease" in §365 has a formal or functional scope), which is a matter of federal law, than with the second—what body of law identifies a "true lease" under the functional approach? Neither opinion cites *Butner* or any of the Supreme Court's other decisions specifying that state law must be used whenever possible to define the

interests on which the Code operates. If either the second or the ninth circuits believes that federal law answers *all* questions concerning the operation of §365, then we disagree; for the reasons we have given, the third circuit (which in *Continental Airlines* and *Pillowtex* used state definitions) got this right. Indeed, we held exactly this in *Powers*, a decision under §365 that the bankruptcy judge did not mention. *Powers* involves the choice between lease and installment sales contract for personal property; we cannot imagine any reason why state law would define a "true lease" for personal property while federal law would supply the definition for real property.

So what does California law provide? The district judge thought that California allows form to control, and because United and the CSCDA chose the form of a lease United is stuck with that characterization under §365. If indeed California identifies leases in such a mechanical fashion, then its law must yield, but we do not understand it to distinguish leases from secured credit in this way. Neither do we follow the district court's conclusion that form prevails unless "clear and convincing evidence" supports a different characterization. Burdens of proof and persuasion are supplied by the forum, not by the source of substantive law. Bankruptcy law uses the preponderance standard. See *Grogan v. Garner*, 498 U.S. 279 (1991). Anyway, burdens of persuasion are irrelevant to characterization of documentary transactions. See, e.g., *In re Schoonover*, 331 F.3d 575, 577 (7th Cir. 2003); *In re Weinhoeft*, 275 F.3d 604 (7th Cir. 2001).

Like the district judge, the parties in this court seek to find California's law in the decisions of federal bankruptcy judges sitting in California, and they debate the significance of what these judges have said about the subject. Yet federal judges are not the source of state law or even its oracles. To find state law we must examine California's statute books and the decisions of its judiciary. California

has enacted the UCC; there can be no doubt that it uses a functional approach to separating leases from secured credit with respect to personal property. California takes a similar approach for real property as a matter of common law. *Burr v. Capital Reserve Corp.*, 71 Cal. 2d 983, 458 P.2d 185 (1969), and *Beeler v. American Trust Co.*, 24 Cal. 2d 1, 147 P.2d 583 (1944), are especially revealing.

*Beeler* arose from a sale and leaseback of real property. When the tenant stopped paying, the court had to decide whether he could be evicted under landlord-tenant law, with the landlord retaining the fee title to the property, or whether instead the tenant retained an equity of redemption under the law of mortgage loans, so that any payments in excess of the market rental value would redound to the tenant's benefit. The Supreme Court of California characterized the transaction as an equitable mortgage despite the fact that the papers cast it as an absolute deed plus a lease. It relied not only on the fact that the landlord was a financial institution but also on the fact that the rent was equal to the sum needed to pay off a loan and the fact that the lessee would become an owner after some years. (This is the UCC's *per se* rule: If the lessee has an option to acquire ownership at the end of the term for no or a nominal payment, then the transaction must be treated as secured credit.) The yearly rent was $3,000, substantially less than the going rate for similar property but exactly equal to the amount needed to amortize a $60,000 extension of credit—and the $60,000 for which the property had been "sold" initially was less than the market price of equivalent real estate. The state court thought that this deal had all the hallmarks of a mortgage loan except the form— and the form had to yield. This was not a "true lease" as the court saw it.

*Burr* posed the question whether a lease of personal property should be treated as a loan; the answer mattered because at the time California's usury law set a 10% max-

imum interest rate on loans, but there was no price control on leases. Burr needed money to expand his business. He obtained cash by selling some of the existing business's property to a bank and immediately leasing it back at a rental designed to amortize the extension of credit. The Supreme Court of California held that this form must be pierced to get at the substance: Burr had borrowed money on security of the property subject to the lease, and as the interest rate in one of the parties' three transactions exceeded 10% the bank could not collect the full agreed payment.

California has applied this approach in many other cases, which we need not recount. See, e.g., *Lovelady v. Bryson Escrow, Inc.*, 27 Cal. App. 4th 25, 32 Cal. Rptr. 2d 371 (1994). It has been more willing to follow form when that will enhance tax revenues, denying parties a right to pierce their own form at the state's expense, when the state treasury was not privy to the original choice. See, e.g., *Rider v. San Diego*, 18 Cal. 4th 1035, 959 P.2d 347 (1998); *Dean v. Kuchel*, 35 Cal. 2d 444, 218 P.2d 521 (1950). The only state decision to which the district judge referred is of this kind and held that it just did not matter whether a given transaction was a "lease" or something else. *Desert Hot Springs v. Riverside County*, 91 Cal. App. 3d 441, 154 Cal. Rptr. 297 (1979). Instead the question was whether a person who had leased some land from a city for 50 years, built a city hall there, and leased the improved parcel back to the city for a 15-year term (substantially less than the structure's useful life), had retained a "possessory interest" subject to taxation under Cal. Rev. & Tax Code §107. The court's affirmative answer is unhelpful on a question of the kind we confront. Whether the CSCDA has an interest that some other arm of California's government could tax is neither here nor there.

The transaction between United and the CSCDA is not a "true lease" under California law. (i) The "rent" is measured

not by the market value of 20 acres within the maintenance base but by the amount United borrowed. The hell or high water clause demonstrates the lack of connection between the maintenance base's rental value and United's financial obligation. (ii) At the end of the lease, the CSCDA has no remaining interest. The CSCDA stresses that United will not "own" anything as of 2033; it still would be the Airport's tenant. But its full tenancy interest reverts to it for no additional charge. Reversion without additional payment is the UCC's *per se* rule for identifying secured credit. (iii) The balloon payment has no parallel in a true lease, though it is a common feature of secured credit. (iv) If United prepays, the lease and sublease terminate immediately; in a true lease, by contrast, prepayment would secure the tenant's right to occupy the property for an additional period. The parties have not cited *any* case from *any* state deeming an arrangement of this kind to be a "true lease."

We do not doubt that many financing devices are true leases; the lessor owns the property and thus finances its acquisition, relieving the lessee of the need to raise funds itself, and net leases may measure rent by the lessor's financial commitments. United acquired many of its airplanes that way. But in such a transaction the lessee acquires an asset; from the lessee's perspective, it is engaged in securing assets with current value, and it can escape the rental obligation by surrendering the asset. United did not obtain the maintenance base from CSCDA; it already had the base under its lease from the Airport, and could not end the obligation to the CSCDA by vacating the maintenance base. What United did was use an asset (its leasehold interest in the maintenance base) to secure an extension of credit, just as the business did in *Burr*, and as in *Beeler* it agreed to pay "rent" equal to the price of that credit rather than any element of value in the "leased" premises.

The CSCDA has filed a cross-appeal to argue that United's failure to contest the lease within 60 days of its execution

disables it from arguing that the arrangement is not a "true lease." California has what the parties call a "validation statute," which provides this deadline. Cal. Code Civ. P. §860, §869. The cross-appeal is pointless. The CSCDA wants us to affirm rather than alter the judgment, and appellees may advance in support of their judgments any argument preserved in the district court. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479 (1976). The cross-appeal is dismissed as surplusage.

The district judge rejected the CSCDA's contention, stating that it had not been presented to the bankruptcy judge. Although the CSCDA says otherwise, we need not resolve that dispute. State procedures do not matter in bankruptcy. State law defines property rights, but federal law prescribes the hoops through which the litigants must jump. California could not enact a law saying: "§365 always must be applied to documents with the form of leases unless the debtor takes specified steps before entering bankruptcy." Matters that *could not* have been determined before bankruptcy can't be foreclosed because they *were not* so determined. See *Brown v. Felsen*, 442 U.S. 127 (1979). Nor may states insist that questions affecting the outcome of a bankruptcy be adjudicated in state court; the federal bankruptcy jurisdiction is exclusive. Issues that have been resolved in state court (say, in pre-bankruptcy litigation) may well have preclusive effect in the federal litigation. See, e.g., *Grogan*, 498 U.S. at 284-85 n.11; *Brown*, 442 U.S. at 139; *Kelly v. Robinson*, 479 U.S. 36, 47-49 (1986). But states may not compel potential debtors in bankruptcy to use state tribunals before repairing to federal court.

What is more, the state validation statute does not apply on its own terms. United is not challenging the *validity* of the sublease and leaseback. It concedes that the transaction is valid as a matter of state law and that it owes the money. The question under §365 is whether it must pay in full to enjoy continued occupancy or whether, instead, it may

reduce payments to the value of the interest secured by the leasehold and treat the residue as unsecured debt. California's validation statute does not address that question and so is irrelevant in this litigation.

The transaction between United and the CSCDA at San Francisco Airport is a secured loan and not a lease for the purpose of §365. The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*