# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-1460, 05-1461 & 05-1462

IN RE: UNITED AIR LINES, INC.,

*Debtor.*

UNITED AIR LINES, INC.,

*Appellant,*

v.

U.S. BANK NATIONAL ASSOCIATION, INC.,
CITY OF LOS ANGELES, *et al.,*

*Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 04 C 3357, 04 C 3359 & 04 C 3358—**John W. Darrah**, *Judge.*

———————

ARGUED FEBRUARY 16, 2006—DECIDED MAY 4, 2006

———————

Before BAUER, EASTERBROOK, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* To fund improvements at its facilities in the Los Angeles International Airport, United Air Lines, Inc., entered into a transaction with a bond-issuing, public entity named the Regional Airports Improvement Corporation ("RAIC"). Through this transaction, RAIC "subleases" certain airport facilities to United. After United entered bankruptcy, the true nature of the transaction was

called into question. In adversary proceedings before the bankruptcy court against RAIC and two related parties (the City of Los Angeles and an indenture trustee), United sought to have the transaction treated as a loan rather than a lease for purposes of § 365 of the Bankruptcy Code, 11 U.S.C. § 365. The bankruptcy court ruled in United's favor, but the district court reversed. United appeals. We addressed a substantially similar matter concerning the San Francisco International Airport in *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 1465 (2006). As in the San Francisco appeal, we agree with United that the Los Angeles transaction is not a lease for § 365 purposes. We therefore reverse the district court's decision to the contrary.

Before detailing the Los Angeles transaction, it is helpful to reiterate the importance of the lease-versus-loan distinction in this context. When a lease is at issue, "[a] lessee must either assume the lease and fully perform all of its obligations, or surrender the property. 11 U.S.C. § 365. A borrower that has given security, by contrast, may retain the property without paying the full agreed price. The borrower must pay enough to give the lender the economic value of the security interest; if this is less than the balance due on the loan, the difference is an unsecured debt. *See* 11 U.S.C. § 506(a) and § 1129(b)(2)(A)." *United Airlines*, 416 F.3d at 610.[1]

---

[1] We add a brief word about United's plan of reorganization, which the bankruptcy court confirmed on February 1, 2006, thereby enabling United to "exit" bankruptcy. At oral argument, United informed us that, under the plan of reorganization, the disputed transaction here is provisionally treated as a lease, consistent with the most recent judicial ruling on the matter, that

(continued...)

Since at least 1982, United has leased its space in the Los Angeles airport from the City of Los Angeles. In order to arrange financing to improve and construct facilities in that space, United worked with RAIC, which, as a public entity, could issue tax-exempt bonds. RAIC was formed by the City, but it is a separate legal entity. United's lease with the City anticipated that United would use RAIC's bond-issuing authority to fund the development of the airport facilities. On November 15, 1982, United and RAIC executed a transaction to achieve that end.

Two agreements are at the heart of the United-RAIC transaction. The first agreement is termed the "partial assignment," through which United assigned a portion of its leasehold (i.e., its interest under its lease with the City) to RAIC. In return, RAIC issued tax-exempt bonds, raising $75,750,000 to develop the facilities in question. Administrative matters related to these bonds, such as distributing payments to bondholders, are handled by an indenture trustee, currently U.S. Bank N.A.

The second agreement is entitled the "facilities sublease." Under this agreement, RAIC "leased" back the then to-be-developed facilities to United. In exchange, United pays "rent" that is equal to the amount necessary to cover the payments to the underlying bondholders plus administrative costs. Currently, the bondholders receive periodic interest-only payments and are also entitled to balloon

_____

(...continued)

of the district court. Furthermore, United conditionally assumed this "lease." Nevertheless, according to United, this conditional assumption will terminate if, in the end, this transaction is judicially determined to be a loan. In which case, it will then be treated as pre-petition debt. Accordingly, we have a live, justiciable controversy before us.

payments for the outstanding principal, now $59,390,000, when the bonds mature. United has already redeemed bonds totaling $16,360,000 of the original $75,750,000. Presently, there are two sets of bonds outstanding. One set, with a balloon payment of $34,390,000 is due to mature on November 15, 2012, and the other, with a balloon payment of $25,000,000, is due to mature on November 15, 2021. These periodic and balloon "rental" payments from United go through the indenture trustee to the bondholders. The term of the sublease is completely dependent upon United's payment or redemption of the bonds. As such, the sublease is scheduled to expire in 2021 with the payment of the final set of outstanding bonds unless United redeems all the bonds earlier.

In the earlier appeal regarding United's dealings at the San Francisco airport, we resolved two key issues for deciding whether a transaction, such as the one before us, is a lease under § 365 of the Bankruptcy Code. The first issue was whether the form of the document should be controlling in this situation—that is, whether a transaction should be treated as a lease simply because the parties titled it a "lease" and used terms such as "rent." Agreeing with a number of other circuits' opinions, we concluded that § 365 mandates that the substance of the transaction trumps the form of the transaction. *See United Airlines*, 416 F.3d at 612 (citing *In re PCH Assocs.*, 804 F.2d 193, 198-200 (2d Cir.1986); *In re Pillowtex, Inc.*, 349 F.3d 711, 716 (3d Cir. 2003); *In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182-84 (9th Cir. 1988); *In re Pac. Express, Inc.*, 780 F.2d 1482, 1486-87 (9th Cir. 1986)). We reasoned: "It is unlikely that the Code makes big economic effects turn on the parties' choice of language rather than the substance of their transaction; why bother to distinguish transactions if these distinctions can be obliterated at the drafters' will?" *United Airlines*, 416

F.3d at 612. Accordingly, we held that, as a matter of federal law, the genuine nature of a transaction will prevail over the titles and terms used. *See id.* at 612-14.

The second issue we tackled in the prior case was whether federal or state law governed the lease-versus-loan determination—in other words, to which law should courts look to ascertain the "aspects of substance" that are important in deciding whether a transaction is a lease. *Id.* at 614. Because the Bankruptcy Code is silent on which economic features should shape the inquiry, we determined that, in general, the state law is controlling. *See id.* at 615 ("All of the states have devoted substantial efforts to differentiating leases from secured credit in commercial and banking law. Leases are state-law instruments, after all, and the norm in bankruptcy law is that contracts (of which leases are a species) and property rights in general have the same force they would have in state court, unless the Code overrides the state entitlement."). There is, however, an exception to this general rule. State law will not control if it conflicts with federal law by requiring a formalistic rather than a functional approach as described above. *See id.* This exception is not a concern in the present appeal. The applicable state law here is that of California, and, as we already determined in the San Francisco appeal, California law does not conflict with federal law in this regard. *See id.* at 615-16 (explaining *Burr v. Capital Reserve Corp.*, 458 P.2d 185 (Cal. 1969) and *Beeler v. Am. Trust Co.*, 147 P.2d 583 (Cal. 1944)); *see also Milana v. Credit Discount Co.*, 163 P.2d 869, 871 (Cal. 1945) ("[I]f [achieving a loan is] the intent of the parties the transaction will be deemed a loan regardless of its form.").

The similarities between the substance of the present transaction (described above) and the substance of the transaction in our earlier opinion concerning the San Francisco airport are important. In the prior case, United

had a long-running, traditional airport lease with the City and County of San Francisco. *See United Airlines*, 416 F.3d at 611. Then, to improve its facilities at the San Francisco airport, United worked with a bond-issuing, public entity named the California Statewide Communities Development Authority ("CSCDA"). *See id.* Through a series of agreements, CSCDA gave United $155 million in bond revenues to develop airport facilities. *See id.* at 611-12. The deal called for United to "sublease" a portion of its underlying leasehold with the City and County of San Francisco to CSCDA. *See id.* at 611. Then, CSCDA "leased" this same portion back to United in exchange for United's promise to make periodic "rental" payments that equated to the amounts needed to pay interest on the aforementioned bonds plus some administrative fees. *See id.* Additionally, United had to make a $155 million balloon payment at the end of the "lease" in order to retire the bonds. *See id.* An indenture trustee, HSBC Bank USA, N.A., administered bond-related matters for CSCDA, which included receiving United's "rental" payments and distributing those payments to the bondholders. *See id.* at 612.

There, like here, after United entered bankruptcy, the parties disputed whether the United-CSCDA transaction concerning the San Francisco airport was a lease under § 365. In our review of the substance of that transaction under California law, we concluded that it was a secured loan and not a lease based upon five aspects of the transaction: (1) the fact that United's "rental" payments were tied to the amount borrowed from the bondholders; (2) the presence of a balloon payment; (3) the presence of a "hell or high water" clause, meaning United had to pay the full "rental" amount if even the property became unusable; (4) the fact that prepayment of United's obligations would end the United-CSCDA arrangement; and (5) the fact that

CSCDA did not have a remaining interest in the property at the end of the transaction. *See id.* at 617.

Each of these factors is present in this case as well. Accordingly, for the reasons discussed below, we likewise conclude that the United-RAIC transaction involving the Los Angeles airport is not a lease for § 365 purposes. We will examine each point in turn.

First, in the San Francisco transaction, United's "rent" was based not upon the market value of the property in question but rather upon the amount United borrowed to develop its airport facilities. *See id*. at 617. Similarly here, United's "rent" is linked to the amount it borrowed, albeit indirectly, from the bondholders. Although RAIC claims that United's "rental" payments represent market-value compensation to RAIC for the use of the facilities, the United-RAIC sublease explicitly equates "rent" to the sum needed "to pay the interest on, premium, if any, and principal of the Bonds." The substance here is thus more indicative of loan payments rather than traditional rental payments that compensate the lessor for the lessee's consumption of the lessor's property. *See id.* at 616-17; *Beeler*, 147 P.2d at 592 (linking rental payments to an interest rate "constitute[d] a 'strong circumstance' tending to show that the 'rent' under the lease agreement was in reality an interest payment consistent with the character of the transaction as a loan"); *Rochester Capital Leasing Corp. v. K & L Litho Corp.*, 91 Cal. Rptr. 827, 830 (Cal. Ct. App. 1970) (supposed " 'rental' amounts were calculated with an eye upon [the supposed lessor's] expected rate of return on its investment" thereby indicating that the disputed transaction was a loan); *Golden State Lanes v. Fox*, 42 Cal. Rptr. 568, 569, 571-72 (Cal. Ct. App. 1965).

Second (and closely related to the first point), the San Francisco transaction involved a balloon payment, and there

we observed that "the balloon payment has no parallel in a true lease, though it is a common feature of secured credit." *United Airlines*, 416 F.3d at 617. Here as well, United is required to make balloon payments to retire the outstanding principal when the bonds mature in 2012 and 2021. At its core, "[a] loan of money is the delivery of a sum of money to another under a contract to return at some future time an equivalent amount." *Sw. Concrete Prods. v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990); *see also Milana*, 163 P.2d at 871. The balloon payments here are tremendously revealing in this regard. They make plain that, at the outset, United borrowed $75,750,000 and promised to return that same $75,750,000 in the future. United's balloon obligations are thus powerful evidence that the design of this transaction is that of a loan. *See United Airlines*, 416 F.3d at 617; *Golden State*, 42 Cal. Rptr. at 569, 571-72 (disputed transaction held to be a loan when the supposed lessee received $150,000 to fund a construction project, was then obligated to pay $30,000 per year for eight years (i.e., interest), and was further obligated to return the $150,000 at the end of the eight-year term (i.e., principal)).

Third, the San Francisco transaction contained a "hell or high water" clause which showed a telling disjoint between rental value and United's actual financial obligations. *See United Airlines*, 416 F.3d at 617. A similar clause is present here. Under the sublease, United must continue paying "rent" to service and ultimately retire the bonds even if the premises at issue are condemned, destroyed, or otherwise become unusable. The clause characterizes United's "rental" obligation as "absolute and unconditional." *See Golden State*, 42 Cal. Rptr. at 571-72 (disputed transaction held to be a loan when the supposed lessee was "unconditionally obligated" to make periodic payments and "absolutely bound" to repay an identical sum that had been advanced to it at the outset of the transaction). This clause stands in

stark contrast to the more typical provision in the underlying lease between United and the City of Los Angeles. In that lease, if the premises are destroyed, the City must abate United's rent while the premises are unusable. Further, United may, in certain situations, terminate the lease if the City, when required to do so, cannot make the necessary repairs within a reasonable time. At bottom, the "hell or high water" clause in the United-RAIC sublease is further evidence that the "rent" here is not payment for the value of using the facilities but rather is for the value of the money borrowed. *See United Airlines*, 416 F.3d at 617; *Golden State*, 42 Cal. Rptr. at 571-72.

Fourth, in the San Francisco transaction, if United prepaid its financial obligations, the prepayment terminated the lease arrangement in that transaction. *See United Airlines*, 416 F.3d at 617. Likewise here, the United-RAIC sublease will immediately terminate if United prepays the bonds. Such a prepayment provision has a useful purpose in the financing context. In the event interest rates become more favorable, a borrower would ordinarily prefer a prepayment option in an agreement so as to have the opportunity to refinance its debt. By contrast, such a prepayment/termination provision would be superfluous in the context of a lease. It would make little economic sense for a lessee to prepay its full rental obligations and thereby cause its lease to terminate and the value of its prepayment to evaporate. Rather, with such a prepayment, the lessee would want to see the lease to its natural end, either to occupy or to sublet the premises for the prepaid period. Consequently, the prepayment-termination nexus in this arrangement further shows that the substance here is that of a loan, not a lease. *See id.*

Fifth, in the San Francisco case, the fact that CSCDA did not have a remaining interest in the property at the end of

the transaction was another indicator of a loan. *See id.* RAIC
is in the same position here. RAIC acquired its interest here
through the partial assignment from United, and, under its
terms, the assignment terminates when United retires the
bonds and thereby terminates the United-RAIC sublease.
RAIC, therefore, has no reversionary interest when the deal
ends—much like a lender when a secured loan is paid off.
*See id.*; *Golden State*, 42 Cal. Rptr. at 572 (disputed transac-
tion held to be a loan when the supposed lessor was bound
to fully reconvey the property upon repayment of the sum
it had initially advanced to the supposed lessee). This factor
is yet another reason to view this transaction as a secured
loan and not a lease. Separately, RAIC points out that at the
end of the United-RAIC arrangement, the property at issue
reverts the underlying landlord, the City of Los Angeles.
However, this circumstance does not negate the fact that
RAIC does not have a reversionary interest. To combat this
conclusion, RAIC further attempts to cast itself and the City
as one in the same. However, as mentioned above, RAIC is
an independent legal entity under California law. *See Rider
v. City of San Diego*, 959 P.2d 347, 349, 350-52 (Cal. 1998).

   RAIC raises an additional point that bears mentioning. In
the San Francisco transaction, the bond-financed develop-
ments were not built upon the portion of United's leasehold
that United "subleased" to CSCDA to secure the deal. *See
United Airlines*, 416 F.3d at 611. Here, by contrast, the bond-
financed developments are constructed upon the property
that United assigned to RAIC. RAIC contends that this
difference establishes that United's payments are true rental
payments in that they show that the payments were com-
pensating RAIC for United's use of the facilities and not for
the value of borrowed money. However, the property
disconnect in the San Francisco case only made it more
obvious that United's payments were not rental payments.

The lack of a similar disconnect here does not override the discussion above. In other words, it does not alter the fact (1) that the United-RAIC sublease expressly ties United's so-called rent to the interest and principal payments on the bonds, (2) that the arrangement required United to return the $75,750,000 initially advanced, (3) that the deal unconditionally obligated United to make payments even if the premises became unusable, (4) that United's prepayment would terminate the supposed sublease, and (5) that RAIC has no reversionary interest in the property at the conclusion of the arrangement. The presence of these considerations here strongly points to the existence of a secured loan and not a lease.

Each side raises additional points in support of their respective positions, but they do not compel elaboration here. It suffices to say that United's Los Angeles transaction with RAIC has all the hallmarks of a secured loan that were critical to our decision in the San Francisco appeal. In a fashion similar to the San Francisco arrangement, United used a leasehold interest to acquire financing from bondholders, and United's payments to the bondholders do not resemble true rental payments. We see no grounds to treat the San Francisco and Los Angeles transactions differently in this context. Accordingly, the transaction between United and RAIC concerning the Los Angeles airport is a secured loan and not a lease for purposes of § 365. The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

A true Copy:

     Teste:

                         _____

                         *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*