In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1459

IN RE:

UNITED AIR LINES, INC.,

*Debtor.*

UNITED AIR LINES, INC.,

*Plaintiff-Appellant*,

*v.*

HSBC BANK USA as paying agent, and
CITY AND COUNTY OF DENVER,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 2839—**John W. Darrah**, *Judge.*

———————

ARGUED FEBRUARY 16, 2006—DECIDED JULY 6, 2006

———————

Before BAUER, EASTERBROOK, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* In 1992, to operate at the then-new Denver International Airport, United Air Lines, Inc., entered an agreement entitled the "Special Facilities and Ground Lease" with the City and County of Denver (collectively "Denver"). Through this agreement, United leased ground

space and also certain, to-be-built facilities at the airport. Instead of building the facilities at issue itself, Denver agreed to have United build the facilities that United would be using. To fund this construction by United, Denver issued tax-exempt municipal bonds, raising $261,415,000 for the project. United services these bonds indirectly through the payment of "facilities rentals" under the lease. After United entered bankruptcy in 2002, the true nature of this agreement became a point of dispute. In an adversary proceeding before the bankruptcy court, United sought to have the bond-related portions of the agreement severed from the rest of the agreement and treated as a loan rather than a lease for purposes of § 365 of the Bankruptcy Code, 11 U.S.C. § 365. The bankruptcy court ruled that the agreement could not be severed, and it further concluded that, taken as a whole, the agreement was a lease. The district court affirmed. United appeals, and we affirm.

## I.

To set the stage for the background and analysis that follows, it is helpful to explain briefly the importance of the lease-versus-loan distinction in this bankruptcy context. When a debtor's lease is at issue, "[a] lessee must either assume the lease and fully perform all of its obligations, or surrender the property. 11 U.S.C. § 365. A borrower that has given security, by contrast, may retain the property without paying the full agreed price. The borrower must pay enough to give the lender the economic value of the security interest; if this is less than the balance due on the loan, the difference is an unsecured debt. *See* 11 U.S.C. § 506(a) and § 1129(b)(2)(A)." *United Airlines, Inc. v. HSBC Bank USA,*

*N.A.*, 416 F.3d 609, 610 (7th Cir. 2005).[1]

With that, we turn to the more important details of the Denver-United agreement, the "Special Facilities and Ground Lease." Signed on October 1, 1992, the agreement is for a thirty-one-year term expiring on October 1, 2023, with an optional nine-year extension to October 1, 2032. The primary purpose of the agreement was to facilitate United moving into and operating at the then-new Denver International Airport for the aforementioned term. To that end, Denver, as owner of the underlying ground, leased forty-five acres to United and also leased certain, to-be-built facilities, including a terminal/concourse facility, an aircraft maintenance facility, a ground equipment maintenance facility, a flight kitchen, and an air freight facility. Throughout, the agreement refers to the ground and facilities jointly as the "leased property."

United's payments for its use of the ground are straightforward. United pays monthly "ground rentals," which are based upon a per-square-foot rate and the cost of common-use items that Denver provides for the entire airport, e.g.,

---

[1] We add a brief word about United's plan of reorganization, which the bankruptcy court confirmed on February 1, 2006, thereby enabling United to "exit" bankruptcy. At oral argument, United informed us that, under the plan of reorganization, the disputed portion of the transaction here is provisionally treated as a lease, consistent with the most recent judicial ruling on the matter, that of the district court. Furthermore, United conditionally assumed the lease. Nevertheless, according to United, this conditional assumption will terminate if, in the end, this transaction is judicially determined to be a loan. In which case, it will then be treated as pre-petition debt. Accordingly, we have a live, justiciable controversy before us.

trash removal, snow removal, law enforcement, etc. United pays the ground rentals directly to Denver, the landlord. This portion of the agreement, as United admits, has all the hallmarks of a true lease for purposes of § 365.

United's payments for the facilities are slightly more involved, which is primarily due to the fact that, at the inception of the lease, the facilities still had to be built. To construct the facilities at issue, Denver conceivably could have raised bond money, used that money to build the facilities itself, and then charged United a traditional form of rent for United's use of the facilities. Denver did not do that. Instead, it raised bond money—which, as municipal bonds, paid tax-exempt interest—and then turned that money, totaling $261,415,000, over to United so that United could build the facilities that United would be using for the term of the lease. Still, the ownership and title of the facilities rest with Denver, and, when the lease ends, possession of the facilities reverts to Denver.

To all this, there is an additional layer of intricacy. Theoretically, Denver could have collected traditional rental payments from United for the use of the facilities and then used that source of income to service the bonds itself. That did not happen here. Instead, Denver forwent that revenue stream and, in lieu of traditional rental payments, had United make payments to service the bonds, albeit indirectly. The parties' agreement refers to these bond-related payments as "facilities rentals." The amount and timing of the facilities rentals correspond to the amounts and deadlines associated with the payment of interest and principal on the bonds. Denver does not collect the facilities rentals. Rather, United pays the facilities rentals to a third party, called the "paying agent." The current paying agent is HSBC Bank USA, N.A. Consistent with the parties' frame-

work, United's payments to the paying agent are "for the account of" (on behalf of) Denver as the municipality that issued the bonds. The paying agent is then tasked with making the necessary distributions to the underlying bondholders.

These arrangements appear to have been working smoothly until United entered bankruptcy in 2002. Then, to avoid having the bond-related facilities rentals treated like lease obligations under § 365, United instituted an adversary proceeding against Denver and the paying agent, seeking a declaratory judgment in its favor. After discovery, each side moved for summary judgment. The bankruptcy court first determined that the bond-related portions of the agreement could not be severed from the agreement. That determination required the bankruptcy court to view the agreement as one integrated whole, and, in that light, the bankruptcy court concluded that the agreement had to be treated as a lease for § 365 purposes. The bankruptcy court thus granted summary judgment to Denver and the paying agent. The district court affirmed, and United appeals.

## II.

United's objective as debtor here is to avoid having its bond-related, facilities obligations in the agreement treated as lease obligations under § 365. There is no dispute that, to reach such a result in the context of this case, United must clear two hurdles. First, the bond-related portions of the agreement must be severable from the rest of the agreement, which, with its traditional ground rentals, is indisputably a lease. Second, the substance of the agreement's facilities provisions must genuinely be that of a loan and not a lease.

As followers of the United bankruptcy saga will know, we confronted an issue similar to the second point above

in each of our two prior published opinions concerning United's airport leases. The first two opinions of what is now a trilogy pertained to the San Francisco International Airport, *United Airlines*, 416 F.3d at 609, and the Los Angeles International Airport, *In re United Air Lines, Inc.*, 447 F.3d 504 (7th Cir. 2006).[2] While the cases share similarities, a critical distinction is the fact that the parties in the present case cemented their deal into one document. In the San Francisco and Los Angeles cases (in which we held two supposed lease arrangements to be secured loans), the underlying ground leases were addressed in separate documents. *See United Airlines*, 416 F.3d at 611, 618; *In re United Air Lines*, 447 F.3d at 505-06. Not so here. As recounted above, Denver and United tied their ground and facilities arrangements into a single contract. Therefore, the first order of business in this opinion is to determine if this knot should, or even can, be untied.

Contract severability, as the bankruptcy and district courts correctly pointed out, is a question of state law. *See United Airlines*, 416 F.3d at 615 (citing *Butner v. United States*, 440 U.S. 48 (1979)); *see also, e.g.*, *In re Payless Cashways*, 203 F.3d 1081, 1084-85 (8th Cir. 2000); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 739 (5th Cir. 1996); *In re Qintex Entm't, Inc.*, 950 F.2d 1492, 1496 (9th Cir. 1991); *In re Gardinier, Inc.*, 831 F.2d 974, 975-76 (11th Cir. 1987). The choice-of-law clause in the Denver-United agreement indicates that the state law to be applied here is that of Colorado, and the parties agree that Colorado contract law governs the severability issue at hand.

---

[2] Separately, we disposed of a related dispute regarding the John F. Kennedy International Airport in New York with an unpublished order.

The next matter to address is the standard of appellate review, a point raised at oral argument. To do so, we must determine if we are confronting a question of law or fact or some mixture thereof. Some Colorado appellate opinions, as discussed at oral argument, have treated contract-severability rulings as questions of fact, reviewing those rulings in a manner akin to the federal clearly-erroneous standard. *See John v. United Adver., Inc.*, 439 P.2d 53, 54, 56 (Colo. 1968); *Peterson v. Colo. Potato Flake & Mfg. Co.*, 435 P.2d 237, 238 (Colo. 1967); *L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1346, 1349 (Colo. Ct. App. 1986). However, those opinions were reviewing bench trials in which the severability dispute turned on the trial court's factual findings. By contrast, when trial courts in Colorado have made severability rulings without the need of factual findings (e.g., based upon the face of the contract, at the summary judgment stage), Colorado appellate opinions have reviewed those determinations as questions of law, subject to independent appellate review. *See Univex Int'l, Inc. v. Orix Credit Alliance, Inc.*, 914 P.2d 1355, 1356, 1357 (Colo. 1996) (reviewing a summary judgment decision, interpreting the language of the disputed contract, and ruling that, by its language, the contract could not be severed as a matter of law); *Stroup v. Pearce*, 288 P. 627, 627 (Colo. 1930) ("Considerable oral evidence was taken on the question of severability, but if there was no ambiguity the contract cannot be varied by parol and we need only examine its face."); *Bond-Connell Sheep & Wool Co. v. Snyder*, 188 P. 740, 742 (Colo. 1920) ("The trial court was eminently right in holding, as matter of law, that the purchases under the contract were not separable . . . ."); *Homier v. Faricy Truck & Equip. Co.*, 784 P.2d 798, 801 (Colo. Ct. App. 1988) ("Whether a contract is indivisible or severable is a question of intention to be determined from the language and subject

matter of the contract itself. . . . The interpretation of an established written contract is generally a question of law for the court. Thus, the interpretation is subject to independent reevaluation by an appellate court."); *cf. L.U. Cattle*, 714 P.2d at 1349 ("The issue as to whether a contract is entire or divisible is one of mixed law and fact, but, to the extent that the intention of the parties is revealed in a written instrument, it is a question of law.").

In this case, the trial court is the bankruptcy court, and it did not conduct a bench trial. Rather, the bankruptcy court's severability ruling was made at the summary judgment stage. It is true that the bankruptcy court faced cross motions for summary judgment, and it is also true that, under certain, rare circumstances, cross summary judgment motions can be converted into a bench-trial-like situation. *See Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1131-32 (7th Cir. 1994). However, that did not happen here. The bankruptcy court's severability ruling was a purely legal ruling and was not based upon any factual findings. Thus, consistent with Colorado law, we review that ruling as a question of law. Handling that question of law, moreover, is a federal law concern; while state law controls the substance of the appeal, federal law supplies the standard of appellate review. *See In re Kmart Corp.*, 434 F.3d 536, 541 (7th Cir. 2006) (citing *Mayer v. Gary Partners & Co.*, 29 F.3d 330, 332-35 (7th Cir. 1994)); *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 803 (7th Cir. 2003); *Myers v. County of Lake*, 30 F.3d 847, 851 (7th Cir. 1994). Accordingly, our review of the bankruptcy court's decision here is the customary federal summary judgment standard: de novo review. *See In re United Air Lines, Inc.*, 438 F.3d 720, 727 (7th Cir. 2006).

With cross summary judgment motions, we construe all facts and inferences therefrom "in favor of the party against

whom the motion under consideration is made." *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2004) (internal quotation omitted); *see also In re United Air Lines*, 438 F.3d at 727. Further, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also In re United Air Lines*, 438 F.3d at 727; *Kort*, 394 F.3d at 536.

Settled on the standard of review, our next step is to apply Colorado's severability rule to the contract before us. Colorado law places a heavy burden on the party seeking to sever a contract. The rule is: "A contract cannot be severed unless the language of the contract manifests each party's intent to treat the contract as divisible." *Univex*, 914 P.2d at 1357 (citing *Homier*, 784 P.2d at 801). Even if the parties entered a multi-part contract, that contract cannot be severed after the fact if the parties entered it "as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." *John*, 439 P.2d at 56 (internal quotation omitted); *see also Homier*, 784 P.2d at 801 ("[F]or for a contract to be severable, the language of the contract must evince the parties' intention to have assented separately to successive divisions of the contract, upon performance of which the other party would be bound. Thus, it is not the number of items in the contract which is determinative of whether it is severable, but the nature of the object or objects in the contract." (citing *L.U. Cattle*, 714 P.2d at 1349; *Gomer v. McPhee*, 31 P. 119, 120 (Colo. Ct. App. 1892))); *cf. Tilbury v. Osmundson*, 352 P.2d 102, 105 (Colo. 1960) ("The contract between the parties was not divisible. It was one single transaction.").

To see how Colorado's rule works in practice, we briefly review two helpful examples. The first example is from the Supreme Court of Colorado's opinion in *Campbell Printing Press & Manufacturing Company v. Marsh*, 36 P. 799, 802 (Colo. 1894). In that case, the plaintiffs entered a contract to purchase a printing press and a paper folder from the defendant. The defendant delivered the press without incident but could not come through with the contracted-for folder in a timely fashion. Without the folder, the plaintiffs could not use the press as they had intended. The plaintiffs thus sought to rescind the entire contract and return the press. The defendant wanted to sever the contract into two parts so as to preserve its sale of the press. The Supreme Court of Colorado would have none of it. The court, observing that the press was "practically valueless" to the plaintiffs without the folder, stated that "had [the defendant's] failure been anticipated, [the plaintiffs] would not have made the contract of purchase." *Id.* at 802. The court thus held that the contract was "entire and indivisible" and that the plaintiffs had the right to rescind the whole contract. *Id.* Bottom line, because the plaintiffs would not have entered the contract if they could not obtain the press and the folder jointly, the contract could not be severed into a press-only deal and a folder-only deal.

The second and more recent example is from the Colorado Court of Appeals' opinion in *Homier v. Faricy Truck & Equipment Company*, 784 P.2d 798, 799-801 (Colo. Ct. App. 1988). In *Homier*, the plaintiffs entered a contract with the defendant to purchase a truck with a "dump body," which is a device attached to truck's cab and chassis that enables a truck to shed its payload. The purchase price for this dump truck was $47,863, of which $7,500 was explicitly allocated for the dump body. After delivery, the truck was constantly out of service for repairs due to repeated prob-

lems with the dump body. In the first seven months after delivery, the truck was operational for a mere thirty days. The plaintiffs thus sought to revoke their acceptance of the entire truck. Much like the defendant in *Campbell Printing*, the defendant in *Homier* wanted to sever the contract into two parts, one for the truck and one for the dump body. The Colorado Court of Appeals rejected the defendant's approach. Notwithstanding the allocation of $7,500 for the dump body, the court determined that, based upon the contract, the purchase of the truck with a dump body was one integrated deal. The court, in no uncertain terms, stated: "The contract calls for the purchase . . . of a truck, consisting of a cab and chassis with a 15-foot dump body. Nowhere does it indicate any intention of the parties that the cab and chassis be considered separate and apart from the dump body." *Id.* at 801. Consequently, as with the contract in *Campbell Printing*, the contract in *Homier* could not be severed after the fact because the plaintiffs would not have entered the contract if they could not jointly obtain a truck with a dump body.

These examples put meat on the language quoted above from the Supreme Court of Colorado's opinion in *John v. United Advertising, Inc.*, 439 P.2d 53, 56 (Colo. 1968)—"a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." In *Campbell Printing*, the printer-folder contract was not severable because there would have been no bargain at all if the folder provisions of the contract were struck out. 36 P. at 802. Likewise, the dump truck contract in *Homier* was not severable because there would have been no bargain to begin with if the dump-body portion of the contract were struck out. 784 P.2d at 801.

The same is true here with the Denver-United agreement. On its face, this contract is an inherently integrated bargain:

an agreement for a leasehold coupled with a bond arrange-ment to improve that leasehold. Importantly, given the context of this case, the parties' bond arrangement—as with the press in *Campbell Printing* and the truck in *Homier*—is not and could not have been a lone-standing bargain. In other words, the parties would not have entered the bond-related portion in the complete absence of the leasing portion. Under no conceivable circumstances would Denver have given the proceeds of its bonds to United in this manner to develop airport facilities if United did not also have a leasehold at the new airport upon which to build and then operate those facilities. By the same token, United is in the business of flying airplanes, not constructing airport facilities, and United would never have undertaken the bond-related obligations in this deal if it did not also have a leasehold upon which to operate at the new airport. Simply stated, without a ground lease, there was no need for this particular bond arrangement. Even though, similar to situations in *Campbell Printing* and *Homier*, Denver and United could have separated this deal into two contracts, they did not, and their decision to unite their interdependent ground and facilities objectives into a single contract at the outset cannot now be undone after the fact under Colorado law. *See Campbell Printing*, 36 P. at 802; *Homier*, 784 P.2d at 801; *see also Univex*, 914 P.2d at 1357 (applying *Homier* to a joint sales and financing agreement); *Bond-Connell*, 188 P. at 742 ("It is an entire contract as by its terms it contemplates that each and all of its parts, material provisions and considerations, are interdependent and common each to the other."). Therefore, we view this joint lease-and-bond agreement "as a single whole" because "there would have been no bargain whatever, if [the lease-related] promises were struck out." *John*, 439 P.2d at 56. It cannot be severed.

Before concluding, we briefly address United's arguments in favor of severability. United puts forth several reasons why the ground lease and the facilities arrangement could have been forged separately. For instance, United claims that, but for a simple matter of administrative convenience, the two portions of this agreement would not have been shuffled together. United also cites to the existence of differing payment and default provisions for the leasing portion and the bond-related portion of the agreement as well as the differing purposes behind each of these two portions. While it is true that there is one set of payments for the ground lease and another set for the bond-oriented facilities rentals, *Homier's* handling of the $7,500 allocation for the dump body demonstrates that the existence of apportionable sums alone is not dispositive. 784 P.2d at 799, 801; *cf. John*, 439 P.2d at 56 (apportionability *a* factor, not the only factor). What is more, United's arguments here do not meet Colorado's rule for severing a contract; just because the parties *could have* entered two contracts at the outset is not the test. Denver and United entered one contract, and that contract cannot be divided after the fact simply because one party later finds that it would have been more advantageous to have entered two contracts instead of one.

Additionally, United cites to a local Denver ordinance, Ordinance 626, which predated the Denver-United agreement by some eight years. United contends that Ordinance 626 shaped the parties' intent (or at least Denver's) to enter two separate contracts here, not one. The theory goes that, since Ordinance 626 implicitly calls for Denver to enter lease and bond agreements separately, Denver could not form, and thus never did form, an intent to enter a unitary lease-and-bond contract with United in this case. Even taking United's interpretation and application of Ordinance 626 as correct, United's argument is nonetheless undermined by

Ordinance 712, which Denver adopted contemporaneously with the Denver-United agreement at issue. As Denver and the district court point out, Ordinance 712 contemplates a single document with a leasing portion and bond-oriented portion. United counters that Ordinance 626 provided the foundation for Ordinance 712 and should thus control. Nevertheless, to the extent there is an inconsistency between the two ordinances, the later-enacted Ordinance 712 provides for the repeal of any inconsistent language in prior ordinances. As a result, United's reliance on Ordinance 626 is misplaced.

United also relies on the severability clause in the Denver-United agreement for support. This standard form saving clause states: "In the event any provision of this Lease shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof." This clause, however, does not manifest an intent to single out any particular division of the agreement, let alone a division of the agreement into a defined ground leasing portion and a defined bond-related facilities portion. Rather, this clause simply shows that the parties had the general and customary intent to have as much of their agreement survive adverse judicial intervention as possible. Without more, this clause does not support United's position.

In sum, for all the reasons articulated above, the Denver-United agreement cannot be severed under Colorado law. Having reached that conclusion, our resolution of the rest of the case becomes elementary. Since the agreement must be treated as one indivisible whole, the issue then becomes whether that whole should be treated as a lease under § 365. In that regard, United concedes that the agreement's ground lease provisions constitute a true lease. Furthermore, under

no circumstances could those ground lease provisions (which dominate the agreement's subordinate facilities provisions) be considered a financing arrangement and thereby allowed to escape the rigors of § 365. United offers no argument to the contrary on this point. Accordingly, as the bankruptcy court correctly concluded, the Denver-United agreement as a whole must be treated as a true lease for purposes of § 365. Finally, to be thorough, we note that our resolution of matters above obviates any need for us to reach the second issue outlined at the beginning of this analysis section, namely, whether the agreement's facilities provisions are a stealth financing arrangement. They very well may be, but that point is now moot in light of our severability determination.

## III.

Under Colorado law, Denver and United's Special Facilities and Ground Lease, with its interdependent ground and facilities provisions, is a single, inseverable whole in that there would have been no bargain whatsoever had the ground provisions been absent from the deal. While the parties could have separated this complex arrangement into two contracts, they did not, and their decision to join their entire agreement into one contract at the outset cannot now be undone after the fact under Colorado law. Furthermore, as a whole, this agreement must be treated as a true lease for purposes of § 365.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*