**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 25-4033**

───────────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CHRISTOPHER KENJI BENDANN,

Defendant – Appellant.

───────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Senior District Judge.  (1:23−cr−00278−JKB−1)

───────────────

Argued:  May 8, 2026                    Decided:  June 25, 2026

───────────────

Before DIAZ, Chief Judge, and AGEE and QUATTLEBAUM, Circuit Judges.

───────────────

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Agee and Judge Quattlebaum joined.

───────────────

**ARGUED:**  Allen Howard Orenberg, THE ORENBERG LAW FIRM, LLC, Rockville, Maryland, for Appellant.  Mary Jessica Kirsch Munoz, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Kelly O. Hayes, United States Attorney, Greenbelt, Maryland, David C. Bornstein, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

───────────────

DIAZ, Chief Judge:

This case arises from a teacher grooming, exploiting, and stalking a minor student. After a six-day trial, a jury convicted Christopher Kenji Bendann of child exploitation, possessing child sexual abuse material[1], and cyberstalking.

Bendann challenges his convictions on three grounds. First, he argues the district court abused its discretion by declining to order a competency evaluation when Bendann experienced suicidal ideation leading up to trial. Next, he says the court should have suppressed evidence obtained from his iPhone because the government discovered the phone's passcode through an unlawful interrogation. And third, he insists that the government didn't hand over a witness's *Jencks* statement.[2] He also attacks his thirty-five-year sentence on one ground: the emotionally charged victim-impact testimony permitted at sentencing.

We find no error in the district court's careful handling of this case. So we affirm.

---

[1] We use "child sexual abuse material" rather than "child pornography" "to reflect more accurately [its] abusive and exploitative nature." *United States v. Kuehner*, 126 F.4th 319, 322 n.1 (4th Cir. 2025).

[2] *Jencks v. United States*, 353 U.S. 657, 668–69 (1957) (government must allow defendants to review its witnesses' pretrial reports); 18 U.S.C. § 3500 (codifying this requirement, and clarifying that it applies solely to written statements the witness adopted and approved, reliable transcripts of statements, or statements made to a grand jury); Fed. R. Crim. P. 26.2 (making this obligation reciprocal).

I.

We recount the facts in the light most favorable to the government. *United States v. Jackson*, 126 F.4th 847, 852 n.1 (4th Cir. 2025).

A.

Bendann was a middle-school teacher, advisor, and coach at an all-boys prep school in Baltimore. The victim was his eighth-grade student and advisee. The advising relationship was no doubt close: Bendann frequently interacted with the student's parents, drove the student and his friends around, and communicated with him in person and through social media.

The sexual abuse at issue here began the student's sophomore year of high school. The student testified that he and his friends (other students) were "scared to tell [their] parents" they'd been drinking, so they'd ask Bendann, whom they knew well and trusted, to drive them home from parties. Joint Appendix (J.A.) 1913. After Bendann picked up the students, he would "make [them] run a naked lap" while he watched. J.A. 1909–11. A classmate recalled that Bendann made them run naked "in exchange for something" like fast food or a ride home. J.A. 2629.

From there, the abuse escalated. Bendann started to pick up the student alone and to require that he strip naked in the car. Bendann eventually coerced the student into engaging in sexually explicit conduct in the car, which Bendann filmed. The abuse

3

continued in homes where Bendann was housesitting, often during house parties. Bendann would summon the student upstairs at these parties and sexually assault him while filming.[3]

When the student resisted these interactions, Bendann threatened to expose explicit images of him. The student tried repeatedly to block Bendann and end contact, but Bendann threatened him with exposure. Bendann also coerced the student into sending explicit photos and videos over Snapchat.

Even after the student graduated, Bendann "forced" him to stay in regular contact. J.A. 1930. Bendann made a private Instagram account and uploaded explicit images of the student to it. If the student didn't answer Bendann's messages promptly, Bendann would either make the account public or request to follow the student's girlfriend and close friends. *E.g.*, J.A. 3251 ("Answer. Answer. Answer. Fuck you. Answer. Answer me now. I'm exposing you. I'm turning it public.")

## B.

After other students reported Bendann's grooming behaviors (including naked runs), the school suspended him and reported him to the Department of Social Services. The Department referred the case to the police. The student came forward shortly after learning of Bendann's suspension.

Detective Shannon Markel, the lead investigator, interviewed the student and obtained his cell phone and iPad. Based on Markel's review of those devices, she obtained

---

[3] Forensic evidence corroborates that Bendann created the five videos corresponding to the five child-exploitation charges in this case when the student was underage.

a search warrant for Bendann's person, home, and car. The warrant authorized officers to search and seize Bendann's electronic devices and any biometric data necessary to unlock them. J.A. 1516.

C.

A joint state-federal task force executed the warrant at Bendann's home. Markel advised Bendann of his *Miranda* rights. She told him that a sealed warrant authorized her to seize his biometric data, specifically his face and hands, to unlock electronic devices. She asked Bendann if he wanted to talk, and he replied "Can I do it with my attorney? She said not to say anything to anyone." S.A. at 8:45–50. Markel didn't question him further.

Investigators seized several laptops and cellphones. Detective Markel placed an iPhone up to Bendann's face to unlock it with Face ID. When the phone didn't recognize Bendann's face, it automatically switched to the passcode screen, and Bendann entered his six-digit passcode. Markel said nothing and made no demands during the very brief interaction. But she could see the first four digits he'd entered: 0701, the month and day of his birthday.

Markel handed the unlocked phone to an FBI agent and verified Bendann's birthdate out loud with her colleague. Bendann confirmed the code out loud—this time, responding to Markel—but only after Markel and her colleague had deduced it.

5

D.

Bendann was arrested and a federal grand jury indicted him.[4]

Bendann moved to suppress evidence obtained from his iPhone. After an evidentiary hearing, the district court denied the motion from the bench. As the court explained, the circumstances under which law enforcement obtained Bendann's passcode were "concerning" but Markel didn't cross the line because she didn't direct Bendann to provide any information. J.A. 1608–09. So the court concluded that Bendann provided his passcode "voluntarily." J.A. 1609.

The district court memorialized its ruling in a written order. There, the court noted that Markel "did not lie or mislead" Bendann, she didn't "say anything to" him when the phone prompted him to enter his passcode, and Bendann "unprompted, entered the six-digit passcode into the cellphone." J.A. 28. So the court concluded that Bendann's "choice to enter his passcode was the product of an essentially free and unconstrained choice." J.A. 30 (citation omitted).

Although the district court posited that Markel's subsequent confirmation of the passcode with Bendann "likely was not" lawful, it declined to decide that issue because Markel obtained the passcode lawfully. J.A. 28 n.2.

---

[4] The grand jury later superseded the indictment, charging Bendann with five counts of sexual exploitation of a child, three counts of possessing child sexual abuse material, and one count of cyberstalking. J.A. 32–42.

E.

Bendann proceeded to trial.  But on the morning of jury selection, he refused to leave his cell.  His counsel represented that they'd asked the jail to screen Bendann for suicidal ideation a week before, but that they didn't "have a basis to raise" his competency.  J.A. 1754–55.  The district court ordered Bendann to appear.

Bendann's counsel changed their tune by the time Bendann arrived in court.  During the recess for Bendann's transport, the government gave his counsel a recording of a jail call between Bendann and his father in which Bendann expressed suicidal thoughts.  That call prompted counsel to move for a psychiatric evaluation (and full competency hearing), based on their view that Bendann's suicidal ideation rendered him unable to assist in his defense.

In response to the district court's questions, Bendann said he was "frustrated with the judicial system as a whole," but described himself as "mentally [and] emotionally stable."  J.A. 1762.  Bendann confirmed that he understood where he was, the charges against him, and the role of his counsel.  He also cogently expressed his grievances with the legal system and how pretrial incarceration stands juxtaposed to the presumption of innocence.

The district court concluded that Bendann hadn't "created a colorable indication" that he suffered "a mental disease or defense rendering him mentally incompetent to the extent that he's unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense."  J.A. 1778.

7

The court then questioned Bendann about his desire to waive his right to be present for trial. Bendann expressed that his objection to attending court was largely rooted in "the indignity of coming over from [jail]" and the food available in the holding cell. J.A. 1782. The court told the Marshals to provide Bendann with a lunch offering consistent with his medical diet, and Bendann ended up attending his trial.

F.

Over six trial days, the government introduced two-hundred-plus exhibits and called seventeen witnesses. Bendann conceded that he was guilty of cyberstalking, but contested the child-exploitation and abuse-material charges.

After deliberating for less than an hour, the jury found Bendann guilty on all nine counts.

G.

The district court held a sentencing hearing. The court calculated Bendann's offense level as 48 and criminal history as category I. Because the guidelines only go to level 43, the court adjusted downward. Those levels correspond with a guideline range starting and ending with life imprisonment.

The student's parents gave victim impact statements. Bendann restated his written motion to strike their testimony, which the district court rejected both times. The court noted that Bendann could "be sure that I understand how proof works and that [] which is submitted to the Court with less corroboration, not in person, not subject to cross-examination, will be accorded appropriately less weight." J.A. 3235.

8

Bendann's father provided a brief statement of support. Bendann's counsel read letters from former students about his positive impact as an educator. And Bendann, who maintained his innocence, spoke directly to the court.

After considering the 3553(a) factors, the court sentenced Bendann to 35 years in prison. And it also imposed lifetime supervised release.

This appeal followed.

## II.

First up, competency.

We review a district court's decision not to order a full competency hearing for abuse of discretion. *United States v. Council*, 77 F.4th 240, 246 (4th Cir. 2023). In evaluating whether a court abused its discretion, we "may not substitute [our] judgment for that of the district court." *United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007). Rather, our job is to "determine whether the court's exercise of discretion . . . was arbitrary or capricious." *Id.* at 743.

## A.

A person is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Put differently, we require that the defendant exhibit "the capacity to understand, the capacity to assist, and the capacity to communicate with his counsel." *United States v. Cabrera-Rivas*, 142 F.4th 199, 210 (4th Cir. 2025) (emphasis omitted).

9

A court *must* order a competency evaluation and full hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).

But "there are no fixed or immutable signs which invariably indicate the need for further inquiry." *United States v. Moussaoui*, 591 F.3d 263, 291 (4th Cir. 2010) (quoting *Walton v. Angelone*, 321 F.3d 442, 459 (4th Cir. 2003)). And because a paper record rarely reflects the nuance of a person's mental state, we show our highest deference to the district court's first-hand interactions with a defendant and observations of his demeanor. *See United States v. Bernard*, 708 F.3d 583, 592 (4th Cir. 2013). For us to disrupt those findings, "the defendant must establish that the trial court ignored facts raising a bona fide doubt regarding [his] competency to stand trial." *Walton*, 321 F.3d at 459.

## B.

We have no trouble finding the district court's handling of Bendann's competency proceedings sufficient. In our view, the court was exceptionally cautious and thorough.

Bendann argues that his suicidal ideation created reasonable cause to believe he was incapable of assisting his counsel. But as the district court explained, there's a fine line between "the effects of a mental disease or defect and . . . understandable distress, even resistance to the circumstances a person is in when they are the subject of a federal grand jury indictment on serious charges and are proceeding to trial." J.A. 1763. And not all distress that warrants mental healthcare compels a competency inquiry.

10

Bendann was frustrated with the legal system and anxious about the severe penalties he faced. But he never expressed or displayed any difficulty understanding the proceeding or engaging with his lawyers. Nor did Bendann offer evidence that he lacked the capacity to consult with and assist his lawyers. If anything, Bendann's critiques and occasional snark "demonstrat[ed] a mind that [was] razor sharp," and showed that he was "quite aware of the circumstances and issues" in his case. J.A. 1778.

Accepting that Bendann experienced suicidal thoughts leading up to trial, every other record fact militates against incompetency. Without more, suicide attempts and ideation aren't enough to require a competency evaluation. *E.g.*, *United States v. Rakestraw*, No. 21-4436, 2023 WL 1519518, at \*4 (4th Cir. Feb. 3, 2023).[5] There's not more here.

As the district court found, Bendann (1) had no record of mental instability, (2) behaved appropriately in court, and (3) expressed nuanced grievances with the legal system. And although Bendann was often demanding and sometimes flippant, he was never irrational.

We defer to the district court's first-hand experiences, but we can also see for ourselves in the record that while Bendann was frustrated with his lot, and experiencing understandable distress, he wasn't incapable of assisting in his defense.

---

[5] Three of our sister circuits agree (and none disagrees). *See Butko v. Budge*, 378 F.3d 880, 892 (9th Cir. 2004); *Mata v. Johnson*, 210 F.3d 324, 330 (5th Cir. 2000); *United States v. Collins*, 834 F. App'x 537, 541 (11th Cir. 2020).

So we find no error in the district court's decision to forgo a full competency evaluation.[6]

### III.

Next, we tackle Bendann's motion to suppress evidence the police obtained from his iPhone. We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Blake*, 571 F.3d 331, 338 (4th Cir. 2009).

### A.

The Fifth Amendment prohibits law enforcement from compelling a person in custody to testify. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Before any interrogation, officers must inform the person of their rights to remain silent and to an attorney. *Id.* And if the person unambiguously invokes those rights, law enforcement can't continue questioning. *Id.* at 444–45.

We enforce this prohibition through the exclusionary rule, which bars admission of the fruits of any involuntary statement "obtained in violation of *Miranda*." *United States v. Alston*, 941 F.3d 132, 137 (4th Cir. 2019).

---

[6] Before oral argument, Bendann moved to supplement the record. He asked that we consider two medical records that the district court never saw. Alternatively, Bendann sought a limited remand. We denied the motion.

At argument, Bendann's counsel rehashed the motion. We declined to consider Bendann's medical records before argument, and do so again, because our job is to review the record as it existed in the district court. *See* Fed. R. App. P. 10. In any event, the records don't support Bendann's competency arguments: they largely recount gripes with pretrial detention and the legal system, like those Bendann expressed in court. Since the records would not alter the outcome, a limited remand would not be in the interests of justice.

Where, as here, a defendant seeks to exclude evidence because the government violated his *Miranda* right against compelled testimony, we ask five questions. First, whether he was in custody, i.e., he wasn't free to leave. *See Miranda*, 384 U.S. at 444. Next, whether he unambiguously invoked his rights to remain silent and to counsel. *See id.* Third, whether the police officer's conduct amounts to the functional equivalent of an interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

And because *Miranda*'s protections apply only to *compelled* testimony, we also ask whether the defendant gave his statement voluntarily. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). Finally, even if the defendant prevails on each of the above inquiries, we won't apply the exclusionary rule if the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984).

### B.

We needn't reach all five inquiries; we must affirm if the government prevails on any one of them. We take the most straightforward path: voluntariness. We also consider the intertwined matter of whether Markel's conduct amounted to an interrogation.

After an evidentiary hearing, the district court made detailed factual findings to support its conclusion that Bendann entered his iPhone's passcode voluntarily. While we review its legal conclusion de novo, that conclusion stood on careful findings, particularly about the circumstances surrounding the statement, which we defer to absent clear error. *See United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992).

13

A statement is voluntary if it was "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). But even statements that appear voluntary might not be if the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Id.* We look to the totality of the circumstances to make that call. *Id.* at 226.

Bendann fairly emphasizes the intimidating nature of the early-morning search: as the district court found, a weapon-bearing SWAT team entered Bendann's home around 5 a.m. and handcuffed him undressed in his living room. Detective Markel told Bendann about the search warrant but wouldn't show it to him. And she told Bendann the warrant authorized her to use his "face and hands to unlock his electronic devices." J.A. 28.

But by the time Markel approached Bendann with the iPhone, Bendann was uncuffed, clothed, and had been chatting politely with her. Markel didn't hold the phone up for long, she didn't say anything, and Bendann entered his passcode within seconds.

On these facts, we can't find that Bendann's will was so overborne that he would have felt compelled to enter his passcode. We thus agree with the district court's assessment that Bendann "voluntarily, perhaps even reflexively, enter[ed] the passcode." J.A. 30.

While it's not always the case, here, the interrogation and voluntariness questions are two sides of the same coin. It wasn't an interrogation because Markel didn't prompt Bendann to do anything. And the statement was voluntary because Bendann made it unprompted.

14

IV.

Next, *Jencks*.  We assess the district court's decision not to review interview notes in camera for clear error.  *United States v. Savage*, 885 F.3d 212, 220 (4th Cir. 2018).

Bendann insists that the government didn't produce *Jencks* material for Wallace Halpert, one of several of the student's classmates who testified.  At trial, Halpert said that he gave a statement to law enforcement, but he wasn't sure whether his interviewers took notes.  The government, for its part, said it produced all the *Jencks* material it had.

Interview notes count as *Jencks* material—which a party must produce to the other side—only if "the witness has reviewed them in their entirety" and "formally and unambiguously approved them . . . as an accurate record of what he said during the interview."  *United States v. Smith*, 31 F.3d 1294, 1301 (4th Cir. 1994); *see also* Fed. R. Crim. P. 26.2.  For a court to compel the government to produce purported *Jencks* material, the defendant must "make a sufficiently specific request and provide some indication" that a *Jencks* statement exists.  *United States v. Roseboro*, 87 F.3d 642, 645 (4th Cir. 1996).  To lay a foundation that the statement exists, the defendant must show (usually through cross-examination) that the witness reviewed and formally approved the notes of his interview.  *See United States v. Boyd*, 53 F.3d 631, 634 (4th Cir. 1995).

The district court found, and we agree, that Bendann didn't lay such a foundation.  It's exceedingly unlikely that a witness who's unsure if interview notes existed would have reviewed and formally adopted those notes as his own.  And Bendann's counsel didn't ask whether Halpert had reviewed and approved any notes.

15

Bendann strains to suggest that because the government produced a *Jencks* statement from Halpert's mother, it necessarily created (and failed to produce) a statement from her son. But that's speculation, not evidence.

We find no error here, much less a clear one.

V.

We end with sentencing. We review evidentiary rulings—at sentencing and otherwise—for abuse of discretion. *United States v. Stitt*, 564 F.3d 878, 896 (4th Cir. 2001); *United States v. Myers*, 402 F. App'x 844, 845 (4th Cir. 2010).

Bendann insists the district court abused its discretion by allowing emotionally charged testimony from the student's parents at his sentencing. He primarily objects to the parents' testimony about Bendann's choice to exercise his trial right and the student's mother's testimony that she couldn't return to work after learning of the abuse. But Bendann ignores the breadth of information courts can properly consider at sentencing.

Congress granted crime victims—defined broadly to include any person directly or proximately harmed by the defendant's conduct—"the right to be reasonably heard at any public proceeding in the district court involving . . . sentencing." 18 U.S.C. §§ 3771(a)(4), 3771(e). Bendann doesn't contest that the student's parents count as victims, or at least victim representatives.

Moreover, there's "no limitation . . . on the information concerning the background, character, and conduct of a person . . . which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Harm to the student's

16

immediate family—like the mother's harms here—fits comfortably within the capacious bucket of information relating to Bendann's conduct. And family and societal harms are probative of the seriousness of Bendann's offense, which the district court had to consider under § 3553(a)(2)(A).

Bendann's behavior during the case is relevant to Bendann's conduct and the victims' harms too. As the government clarified, the parents' commentary on Bendann's choice to go to trial was within the context of Bendann's continuing efforts to exercise control over the student.

For example, the mother said Bendann's "choice to hold press conferences in order to proclaim his innocence" was "a calculated assertion of power" to make "sure our son felt powerless and vulnerable." JA 1624. In those conferences, Bendann referred to the student as a "whining anonymous victim." J.A. 1624. And the student's father testified that by maintaining his innocence, Bendann inflicted "further pain from public scrutiny" on the family and "chose to maintain control just as he always had." J.A. 1629. They said the trial highlighted Bendann's "complete lack of remorse." J.A. 1624.

We agree with the government that the remarks were not critiques of Bendann's choice to exercise his constitutional rights, but observations about Bendann's lack of remorse and continuing manipulation. Those concerns are relevant to Bendann's conduct and character.

Even so, the district court touched on family harms only briefly—a passing reference to "collateral harms on a nuclear family" within its discussion of the seriousness

17

of Bendann's offense.  J.A. 3282.  The court didn't refer to Bendann's choice to go to trial or even to his conduct during the trial.

There are few limits on the evidence a district court can receive at sentencing.[7] That's because we trust district court judges to weigh evidence appropriately based on their experience and training.

As the district court said it would, it weighed only the portions of the parents' testimony relevant to its 3553(a) analysis.  We're satisfied that the court appropriately protected both the victims' rights to be heard and Bendann's right to a fair sentence.

*AFFIRMED*

---

[7] There are, of course, some limits.  But Bendann didn't argue (for example) that the parents' testimony was unreliable, or that he was denied an opportunity to respond. Nor did he argue that his sentence was procedurally or substantively unreasonable.